

hmg.5.31.25

U.S. Department of Justice

United States Attorney
District of Maryland
Southern Division

---

| | | | |
|---|---|---|---|
| Joseph L. Wenner<br>Assistant United States Attorney<br>joseph.wenner@usdoj.gov | Mailing Address:<br>36 S. Charles Street, 4th Floor<br>Baltimore, MD 21201 | Office Location:<br>36 S. Charles Street, 4th Floor<br>Baltimore, MD 21201 | DIRECT: (443) 831-6983<br>MAIN: 410-209-4800 |

USDC- BALTIMORE
'25 JUL 10 PM3:00

June 2, 2025

Anjali Biala
Northern Division Office
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Anjali_Biala@fd.org

    Re:    <u>United States v. Jennifer Tinker</u>,
            Criminal No. ABA-24-336

Dear Counsel:

    This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Jennifer Tinker (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **June 13, 2025**, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

    1.    The Defendant agrees to waive indictment and plead guilty to a One Count Information, which will charge the Defendant with Wire Fraud, in violation of 18 U.S.C. § 1343. The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

Elements of the Offense

    2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Information, in the District of Maryland,

        a.    Count One – Wire Fraud, 18 U.S.C. § 1343

            i.    There was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises, as alleged in the Information;

Rev. August 2018

ii. The Defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

iii. In execution of that scheme, the Defendant used or caused the use of the interstate wires as specified in the Information.

## Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1343 | N/A | 20 years | 3 years | $250,000 or twice the gross gain (or loss) from the offense | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant

agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4.  The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a.  If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b.  If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c.  If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d.  The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e.  If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant

may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

    h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

    5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

    6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

    a. <u>Count One (Wire Fraud)</u>

      i. The applicable base offense level is **7** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

      ii. The offense level is increased an additional **14** levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), because the loss in this case was more than $550,000, but less than $1,500,000 (subtotal: level 21);

      iii. The offense level is increased an additional **2** levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense resulted in a substantial financial hardship to one or more victim (subtotal level: 23);

      iv. The offense level is increased an additional **2** levels, pursuant to U.S.S.G. § 3B1.3, because the offense involved the defendant abusing a position of private trust in a manner that significantly facilitated the commission and concealment of the offense (subtotal level: 25);

      v. The offense level is increased an additional **2** levels, pursuant to U.S.S.G. § 3C1.1, because the Defendant willfully obstructed and impeded the administration of justice with respect to the prosecution and sentencing of the instant offense and that obstructive conduct related to the instant offense and relevant conduct (subtotal level: 27);

      vi. This Office opposes any reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a). This Office will not make a motion pursuant to U.S.S.G. § 3E1.1(b).

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the charging document. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent that such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum.

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Restitution

11. The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses, which the defendant stipulates is at least $1,191,250. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Forfeiture

12. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: no less than $1,091,250.

14. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

15. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

16. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Defendant's Conduct Prior to Sentencing and Breach

17. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may

make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

19.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

20.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Kelly O. Hayes
United States Attorney

*Digitally signed by JOSEPH WENNER*
*Date: 2025.06.02 23:59:36 -04'00'*

Joseph L. Wenner
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

6/27/2025
Date

_____
Jennifer Tinker

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

06/27/2025
Date

_____
Anjali Biala, Esq.

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, Jennifer Tinker ("**TINKER**") was a resident of Howard County, Maryland at times relevant to this matter. Between in or about January 2020 and in or about November 2023, **TINKER** executed a scheme to defraud her employer – Real Estate Agency 1 – by embezzling funds through wire transfers, Zelle payments, checks, and ACH transfers to her personal bank accounts. **TINKER** attempted to disguise these transfers by listing fictitious real estate entities in the relevant payment records to make the transfers appear business related. To execute and attempt to execute this scheme to defraud, **TINKER** knowingly and willfully transmitted and caused to be transmitted by means of wire communications, in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343, including an interstate wire from Maryland to another state, sending $14,250 from a Real Estate Agency 1 commission account to her personal bank account on or about November 13, 2023. **TINKER** used the funds she stole from Real Estate Agency 1 to pay for luxury goods and personal expenditures, including: concert tickets, airline travel, personal vehicles, designer handbags, and top-of-the-line musical instruments. In total, **TINKER** fraudulently obtained over $1 million of funds belonging to and under the control of Real Estate Agency 1.

Between in or about May 2024, and in or about January of 2025, **TINKER** continued her fraudulent conduct by embezzling funds from a second employer: Non-Profit 1. **TINKER** stole funds from Non-Profit 1 before and after pleading guilty to her fraud on Real Estate Agency 1. In total, **TINKER** fraudulently obtained over $100,000 of additional funds belonging to and under the control of Non-Profit 1.

---

*Fraud on Real Estate Agency 1*

The Defendant worked at Real Estate Agency 1 from approximately 2012 to November 2023. From approximately 2017 until leaving the company, **TINKER** served as Real Estate Agency 1's Market Center Administrator ("MCA"). As the MCA, **TINKER** was responsible for – among other things – accounts receivable, accounts payable, and paying commissions. **TINKER** had access and control over Real Estate Agency 1's bank accounts, including its operating, commission, and escrow accounts. She did not require any review or approvals from superiors to make financial transactions on behalf of Real Estate Agency 1.

Beginning in January 2020, **TINKER** began misusing this authority by fraudulently transferring funds from Real Estate Agency 1's accounts – including its escrow accounts, operating accounts, and commission accounts – to her personal bank accounts. The Defendant made these

initial transfers using a variety of methods, including checks, Zelle payments, and ACH payments. Defendant would transfer the money from Real Estate Agency 1's accounts into accounts in **TINKER's** name at Truist Bank. Tinker would then move these funds among her personal accounts, before then using the funds on personal expenditures. **TINKER** transferred over $100,000 to herself in this manner.

By early 2021, **TINKER** began sending most of these fraudulent transfers to her personal accounts by wire. To hide these transfers, the Defendant listed fictitious "recipients" on the wire transfer paperwork to make these transfers appear legitimate. These fictitious recipients included "MD Homes LLC," "Escrow Release," and "Main Homes." In reality, however, these entities did not exist; **TINKER** wired these funds into her personal bank accounts at Truist Bank. From approximately February 2021 through approximately November 2023, **TINKER** sent herself more than $900,000 through over 90 wires from Real Estate Agency 1's bank accounts to **TINKER's** personal accounts. There was no situation in which **TINKER's** role with Real Estate Agency 1 would have required **TINKER** to wire herself money by listing a fictitious recipient on the wire transfer paperwork.

For example, on or about November 13, 2023, **TINKER** executed a wire transfer of $14,250 from the Real Estate Agency 1 commission account to one of her personal accounts at Truist bank. In the relevant wire transfer paperwork, **TINKER** falsely listed "Main Homes" as the recipient of the funds. **TINKER**, in fact, was the true recipient. On or about November 13, 2023, in executing this wire transfer, the Defendant caused interstate wire communications from Maryland to Truist's servers – located outside of Maryland.

Using her authority as Real Estate Agency 1's MCA, **TINKER** also made materially false and fraudulent edits and entries into Real Estate Agency 1's internal accounting records to conceal the existence of **TINKER's** transfers of Real Estate Agency 1's funds to her personal accounts.

**TINKER** used the funds she stole from Real Estate Agency 1 to pay for luxury goods and personal expenditures. For example, between March 20 and 21, 2023, **TINKER** wired herself $31,500 from Real Estate Agency 1's accounts. Two days later, **TINKER** and her husband began a three-night stay at the Vdara Hotel & Spa at ARIA Las Vegas – for which she paid $2,519.48. **TINKER** also purchased floor tickets to a Luke Bryan concert in Las Vegas on March 24, 2023. Similarly, on or about October 7, 2022, **TINKER** wired herself $9,500 from Real Estate Agency 1's escrow account. That same day, **TINKER** booked a five-day stay at Disney's Caribbean Beach resort for her and her husband for $3,164.22. Additional examples of **TINKER's** lavish lifestyle funded by her embezzlement include:

- On or about December 7, 2021, **TINKER** wired herself $20,000 from Real Estate Agency 1's funds. On or about December 11, 2021, **TINKER** booked a three-night stay at the Sky Suites Panoramic Penthouse at ARIA Las Vegas for $6,029.55.

- On or about November 14, 2022, **TINKER** wired herself $10,000 from Real Estate Agency 1's escrow account. Two days later, **TINKER** purchased two floor tickets to a Taylor Swift Eras Tour concert for $4,635.85.

- Between January 2020 and November 2023, **TINKER** made over $21,000 in purchases from luxury brand Louis Vuitton.

- Between January 2020 and November 2023, **TINKER** made over $13,000 in purchases from luxury brand Balenciaga.

- Between January 2020 and November 2023, **TINKER** purchased five different vehicles (including a 2020 Mazda MX-5 Miata and a 2019 Toyota Tacoma) and paid over $60,000 in vehicle financing during this same time period.

- Between January 2020 and November 2023, **TINKER** made over $167,000 in Amazon purchases.

**TINKER**'s work email account with Real Estate Agency 1 contained receipts documenting these and other personal expenses.

The Defendant continued to embezzle Real Estate Agency 1's funds until her supervisors uncovered her scheme in November 2023. Real Estate Agency 1 then immediately terminated her employment. After **TINKER** was fired, she admitted to her supervisor that she had stolen from Real Estate Agency 1 through, in part, wire transfers disguised as business transactions to her own bank accounts. She also admitted to spending these proceeds on luxury goods and personal items. Later, in a voluntary interview with federal law enforcement, **TINKER** again admitted to embezzling funds from Real Estate Agency 1.

*Fraud on Non-Profit 1*

After Real Estate Agency 1 terminated **TINKER's** employment, **TINKER** continued her fraudulent conduct with a new employer. On or about March 14, 2024, **TINKER** obtained a job as a bookkeeper and office manager at Non-Profit 1. In that position, **TINKER** had access to Non-Profit 1's bank accounts and was responsible for Non-Profit 1's accounts receivable, accounts payable, invoicing, and cash management. **TINKER** did not inform Non-Profit 1 that Real Estate Agency 1 had fired her for her embezzlement.

Beginning on or about May 2024 and continuing through on or about January 2025, **TINKER** embezzled funds from Non-Profit 1's bank accounts. She did so in multiple ways. For example:

- **TINKER** made repeated fraudulent transfers of funds held in Non-Profit 1's operating account to pay off her personal payment card account with Apple/Goldman Sachs.

- **TINKER**, in October 2024, November 2024, and December 2024, submitted proposed Automated Clearing House transfers to Non-Profit 1's president for approval. **TINKER** represented to Non-Profit 1's president that these transfers were rent payments for Non-Profit 1's office. In reality, these payments were fraudulent transfers from Non-Profit 1's operating account to **TINKER's** account with Discover. Relying on Tinker's misrepresentations, Non-Profit 1's president approved these transfers.

**TINKER's** embezzlement of Non-Profit 1 continued before and after she pleaded guilty to defrauding Real Estate Agency 1. In relevant court proceedings, **TINKER** made misrepresentations to the Court about her acceptance of responsibility for her fraudulent conduct and about her employment at Non-Profit 1 in order to continue defrauding Non-Profit 1. At her initial appearance, on December 6, 2024, **TINKER** represented to the Court that she was not a financial risk to Non-Profit 1 and did not have access to Non-Profit 1's bank accounts. This was false. In the 4 weeks following that initial appearance alone, **TINKER** made 13 fraudulent transfers from Non-Profit 1's operating account to her Apple/Goldman Sachs payment card account.

These transfers continued through January 2025, when Non-Profit 1 discovered **TINKER's** embezzlement and terminated her employment for gross misconduct. ~~Upon terminating **TINKER**, Non-Profit 1 personnel discovered that **TINKER**, during her fraud, had collected the unopened bank statements from Non-Profit 1's operating account in her office. To conceal her fraudulent conduct, **TINKER** hid these statements from Non-Profit 1's accountant.~~ 06/26/25 A.B J.T [initials] 7/10/25

Through her conduct, **TINKER** stole at least $100,000 from Non-Profit 1.

SO STIPULATED:

_____
Joseph L. Wenner
Assistant United States Attorney
Digitally signed by JOSEPH WENNER
Date: 2025.06.03 00:00:22 -04'00'

_____
Jennifer Tinker
Defendant

_____
Anjali Biala, Esq.
Counsel for Defendant

13